SO ORDERED.

SIGNED this 17 day of December, 2012.

_____
Randy D. Doub
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
FAYETTEVILLE DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 7 |
| | CASE NUMBER: 09-08367-8-RDD |
| COASTAL PLAINS PORK, LLC, | |
| DEBTOR | |

| | |
|---|---|
| FIRST NATIONAL BANK OF OMAHA, | ADVERSARY PROCEEDING |
| | NUMBER: 09-00214-8-RDD |
| Plaintiff | |
| v. | |
| FARMERS CO-OPERATIVE SOCIETY, SIOUX CENTER, IOWA, and COOPERATIVE ELEVATOR ASSOCIATION, | |
| Defendants | |

## ORDER

Pending before the Court is the Motion for Summary Judgment and the accompanying memorandum of law filed by Farmers Cooperative Society, Sioux Center, Iowa, ("FCS") and Cooperative Elevator Association ("CEA") (together the "Defendants") on July 3, 2012 (the "Defendants' Motion"); the Plaintiff's Response and Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment filed by First National Bank of Omaha (the "Plaintiff")

on August 27, 2012; and the Reply in Support of the Motion for Summary Judgment filed by the Defendants Farmers Cooperative Society, and Cooperative Elevator Association on September 10, 2012.  Also pending is the Plaintiff's Motion for Partial Summary Judgment filed by the Plaintiff on August 27, 2012; the Response by FCS and CEA to the Partial Motion for Summary Judgment filed by FNBO filed on September 17, 2012 by the Defendants; FNBO's Reply and Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of FNBO's Motion for Partial Summary Judgment filed by the Plaintiff on September 28, 2012; and the Supplemental Response by FCS and CEA to the Motion for Partial Summary Judgment filed by FNBO and Reply by FCS and CEA to Their Pending Motion for Summary Judgment filed by the Defendants on October 23, 2012.  The Court conducted a hearing on October 30, 2012 in Wilson, North Carolina to consider these matters.

## BACKGROUND

On September 28, 2009, Coastal Plains Pork, LLC ("Coastal Plains") filed a petition for relief under Chapter 11 of the United States Bankruptcy Code.  On May 3, 2010, the Court granted Coastal Plains' motion to convert the bankruptcy proceeding from a Chapter 11 case to a Chapter 7 case.  Prior to the filing of the bankruptcy petition, Coastal Plains operated a farrow-to-finish farm for the production of swine in several states, including North Carolina and Iowa.  In connection with the hog growing operation, Coastal Plains obtained a loan from the Plaintiff and purchased feed for its hogs from FCS and CEA.  The Plaintiff holds a lien and security interest in the hogs owned by Coastal Plains, which secures the funds the Plaintiff advanced to Coastal Plains, in the original principle

amount of $15,201,222.58, to finance the hog growing operation in Iowa.[1] FCS and CEA are grain suppliers who supplied feed consumed by hogs owned by Coastal Plains between June 2009 and September 2009. FCS filed proof of claim 43 in the amount of $1,097,950.33 and CEA filed proof of claim 39 in the amount of $814,575.17. Both FCS and CEA claim they are entitled to first priority over the Plaintiff's lien as suppliers of feed to livestock pursuant to Iowa Code Chapter 570A.

The Plaintiff filed the complaint initiating this adversary proceeding to determine the priorities between the Plaintiff's perfected security interest and FCS and CEA's agricultural supply dealer liens pursuant to Iowa Code § 570A.5. The main issue between the parties was whether FCS and CEA's failure to comply with Iowa Code § 570A.2 acted as an affirmative defense to FCS and CEA's claim of an agricultural supply lien, or whether Iowa Code § 570A.5(3) established the Plaintiff's lien was junior to FCS and CEA's lien.[2] Iowa Code Section 570A.5(3) provides that a lien in livestock feed shall have priority over an earlier perfected lien or security interest to the extent of the difference between the acquisition price of the livestock and the fair market value of the livestock at the time the lien attaches or the sale price of the livestock, whichever is greater. FCS and CEA filed a motion for partial summary judgment, arguing § 570A.5(3) established their lien had priority over the Plaintiff's prior perfected lien and security interest.

---

[1]The Plaintiff properly perfected its lien on the livestock and the proceeds from the sale of the livestock by filing a UCC-1 financing statement with the North Carolina Secretary of State on October 7, 2008, file number 20080090385G. The parties do not dispute that the Plaintiff has a properly perfected financial institution lien. The Plaintiff filed claim number 33 in the amount of $15,559,286.38 on January 19, 2010.

[2]Iowa Code § 570A.2 requires an agricultural supply dealer, upon the sale of goods on credit to a farmer, to make a certified request to a financial institution that has a security interest in collateral owned by the farmer as to whether the farmer has sufficient net worth to assure payment of the goods sold. Section 570A.2 contains procedural requirements that FCS and CEA admitted were not met.

On July 23, 2010, this Court denied FCS and CEA's motion for partial summary judgment because FCS and CEA failed to submit a certified request to the Plaintiff pursuant to § 570A.2 and found the Plaintiff's lien was superior to any agricultural supplier lien obtained by FCS and CEA. FCS and CEA appealed the bankruptcy court's order to the district court. The Honorable Malcolm J. Howard, Senior United States District Judge for the Eastern District of North Carolina reversed the bankruptcy court's order on September 15, 2011. Judge Howard found "the affirmative defense found in § 570A.2(5) does not apply to the feed lien priority rule in § 570A.5(3)" and that FCA and CEA were "entitled to priority under § 570A.5(3) to the extent of the difference between the acquisition price of the livestock and the fair market value of the livestock at the time they were sold."[3] *Farmers Co-Operative Soc'y of Sioux Center, et al v. First Nat'l Bank of Omaha*, No. 7:10-CV-202-H, at 11 (E.D.N.C. Sept. 15, 2011). On September 20, 2011, this Court entered an order granting partial summary judgment in favor of FCS and CEA pursuant to the order of the district court, and reserved the issue of damages for trial. *First Nat'l Bank of Omaha v. Farmers Co-Operative Soc'y of Sioux Center (In re Coastal Plains Pork, LLC)*, Case No. 09-00214-8-RDD (Bankr. E.D.N.C. Sept. 20, 2011).

In the Defendants' Motion, FCS and CEA assert there are no genuine issues of material fact as to the extent of the liens held by FCS and CEA pursuant to § 570A.5(3) and as such, they are entitled to judgment as a matter of law. FCS and CEA assert that under § 570A.5(3), the extent of the priority a lien in livestock feed has over an earlier perfected lien is calculated by the difference between the acquisition price of the livestock and the fair market value of the livestock at the time the lien attaches or the sale price of the livestock, whichever is greater. Iowa Code § 570A.5(3)

---

[3]The Court notes the affirmative defense is found in Iowa Code § 570A.2(3).

4

(2012). FCS and CEA assert $10,443,256.94 is the net sales price of Coastal Plains' hogs and this amount should be used in calculating the lien because it is the only ascertainable value of the hogs.[4] FCS and CEA assert the acquisition price of the hogs is $2,198,785.50, based on payment of $13.50 per hog to growers for a total of 162,873 hogs.[5] FCS and CEA argue they should be entitled to the full extent of the invoice amounts for feed delivered to the Debtor, plus post-petition interest at 18%, because there is no genuine issue of material fact as to the acquisition price of the hogs. FCS and CEA assert that the highest possible acquisition price is $2,198,785.50. Because the highest possible acquisition price is less than the net sales amount of the hogs, $10,443,256.94, minus the amount of FCS and CEA's claims added together, $1,912,524.50, FCS and CEA assert the Plaintiff can present no genuine issue of material fact that the acquisition cost exceeds $8,530,732.44, and FCS and CEA are entitled to priority of the full invoice amounts for the feed.[6]

---

[4]FCS and CEA assert the gross sales revenue of hogs between September 20, 2009 and March 26, 2010 is $19,992,573.97. From this, FCS and CEA subtract $2,012,480.37 in grower payments and $7,536,836.65 in other costs (which are not detailed) for a net profit of $10,443,256.94.

[5]Coastal Plains contracted with farms in North Carolina to raise the hogs from birth until they were transported to Iowa to be fed out for slaughter. The Defendants assert $13.50 per hog is the contracted for amount of the grower payments to the North Carolina farms, although there were price reductions in this amount at or around the time the Defendants' liens attached.

[6]FCS and CEA suggest the net sales amount, $10,443,256.94, minus the invoice amount, $1,912,524.50, is $8,530,732.44. According to FCS and CEA's calculations, the highest possible acquisition price of the hogs is $2,198,785.50. Therefore, FCS and CEA assert there is no genuine issue of material fact that the acquisition price exceeds $8,530,732.44, which is the least it would need to establish in order to prove that FCS and CEA are not entitled to the full amount of their liens. FCS and CEA maintain that other costs should not necessarily be taken out of the gross sales price, but concede that even if these costs are subtracted, the net sales amount is sufficient to establish that both claims are fully secured.

In the Plaintiff's Response and Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, the Plaintiff asserts § 570A.5(3) is intended to provide a lien in the new value added to the livestock based on the feed supplied. As such, the Plaintiff argues the Defendants have not met the burden of proving the amount of new value created in the hogs by the feed supplied by the Defendants. The Plaintiff asserts Coastal Plains failed to pay FCS for feed supplied between August 21, 2009 to September 14, 2009, or twenty-four days, and failed to pay CEA for feed supplied between June 23, 2009 and September 14, 2009, or eighty-three days.[7] Based on this information, the Plaintiff argues the feed unpaid for only represented a portion of each hog's weight gain while in Iowa. Further, the Plaintiff argues the Defendants improperly rely on the gross sales report of all revenue of hogs sold in Iowa. According to the Plaintiff, the gross sales report cannot be used to accurately determine the new value added to the hogs because the gross sales report includes all hogs sold, not just the hogs that ate the feed Coastal Plains did not pay for. Finally, the Plaintiff asserts FCS and CEA define the acquisition cost too narrowly. The Plaintiff admits $13.50 per hog is an accurate price for the grower payments, but suggests that Coastal Plains incurred other expenses in raising the hogs until they were transported to Iowa. These expenses included medical, feed, overhead, and facilities costs, as well as staffing, insurance, and transportation expenses. The Defendants fail to include these necessary operational costs in calculating the acquisition cost, which is essential, because not all of the increase in the value of a hog is attributable to the value of the feed it ate, but also includes non-feed costs that ensure the hog survives to market weight. The Plaintiff

---

[7]The Plaintiff asserts that after delivery to Iowa, each hog was fed out for 180 days. Based on the amount of time each hog was in Iowa, the Plaintiff suggests the unpaid for feed provided by FCS represented at most 13.3% of the feed eaten by the hogs and the unpaid for feed provided by CEA represented at most 46.1% of the feed eaten by the hogs.

also objects to FCS and CEA's assertion that they are entitled to post-petition interest at 18% per annum pursuant to 11 U.S.C. § 506(b) because § 570A.5(3) limits superpriority to the extent of charges for the cost for unpaid livestock feed.

In the Plaintiff's Motion for Partial Summary Judgment, the Plaintiff seeks a determination that certain charges by FCS and CEA are not, as a matter of law, entitled to superpriority status under § 570A.5(3). In total, the Plaintiff requests the Court find $215,762.81 is not entitled to priority over the Plaintiff's liens. Of this $215,762.81, the Plaintiff asserts FCS is not entitled to priority for $88,112.55 for invoices for feed because FCS failed to properly perfect its lien in livestock feed by adequately describing its collateral in its financing statements.[8] The remaining portion the Plaintiff asserts is not entitled to priority are for charges that are not for the livestock feed itself.[9] Finally, the Plaintiff argues that § 570A.5(3) only grants priority over a prior-perfected security interest for amounts that represent the cost of unpaid livestock feed. As such, the Plaintiff argues FCS and CEA are not entitled to priority over the Plaintiff's security interest for amounts that represent costs related to interest or attorneys' fees, nor costs for other agricultural supplies, services, delivery, fuel, or ordering, mixing, or convenience fees. The Plaintiff suggests the only applicable definition of livestock feed refers to items ingested by the livestock and nothing else.

---

[8]The Plaintiff argues FCS failed to properly identify hogs located on seven farms as collateral for livestock feed delivered. The financing statements describe the collateral as "All livestock located at," followed by specific farm names and addresses. FCS failed to specifically include livestock located at the Back, De Jager, Habben, Hibma, Lincoln, Lux, and Prunty Farms.

[9]The Plaintiff asserts charges for other than livestock feed include: (1) $2,252.33 in FCS interest charges; (2) $1,243.91 in FCS feed transfer services; (3) $65,336.49 in FCS feed processing charges; (4) $6,005.85 in CEA interest charges; (5) $3,272.83 in CEA non-feed charges; and (6) $49,538.85 in CEA feed processing charges.

In the Response by FCS and CEA to the Motion for Partial Summary Judgment filed by FNBO, the Defendants assert they are entitled to post-petition interest on their claims because 11 U.S.C. § 506(b) allows for post-petition interest when a claim is oversecured. Additionally, the Defendants argue they are entitled to the contract price for the feed sold, including delivery, processing, mixing, and other charges. The Defendants assert § 570A.5(3) refers to the retail cost of livestock feed and § 570A.3 provides that charges for labor are included in the cost of an agricultural supply. Therefore, the Defendants argue their liens are not limited to the cost of the materials ingested by the hogs, but include charges for labor and delivery.

Finally, in the Supplemental Response by FCS and CEA to the Motion for Partial Summary Judgment Filed by FNBO and Reply by FCS and CEA to Their Pending Motion for Summary Judgment, the Defendants, in order to avoid further dispute, withdrew from their claims certain charges not related to livestock feed. Specifically, FCS stated it was willing to reduce its claim by $124.08 for comfort board and lumber delivery as well as $1,243.91 for feed transfer services, thereby reducing its total claim as of September 28, 2009 to $1,096,581.26. CEA is also willing to reduce its total claim as of September 28, 2009 by $2,858.87 to $811,715.30, after subtracting charges for non-feed items listed in invoices to Coastal Plains.[10]

---

[10]The purported non-feed items include charges for livestock products such as comfort board, citric acid, actishield 40, compost a mat, and demon wp. These items are used in hog production as linings for hog pens and insecticides. CEA does not concede these items are not covered by its lien, but is willing to reduce its claim in order to avoid the expense of litigation over the relatively small amount.

**JURISDICTION**

Subject matter jurisdiction and jurisdiction over the parties exists pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference of the United States District Court for the Eastern District of North Carolina dated August 3, 1984.

This matter is a core proceeding as set forth in Section 157(b)(2) of Title 28 of the United States Code.

**STANDARD FOR SUMMARY JUDGMENT**

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In making this determination, conflicts are resolved by viewing all facts and all reasonable inferences in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). If there is no genuine issue of material fact, and the issue to be decided is a matter of law, a ruling on a motion for summary judgment is appropriate. However, if there are genuine issues of material fact, then summary judgment is not appropriate.

**ANALYSIS**

**I.    FCS AND CEA'S MOTION FOR SUMMARY JUDGMENT**

The Court holds there are genuine issues of material fact as to the extent of FCS and CEA's liens in the livestock pursuant to § 570A.5(3).  The Iowa Code provides:

> [a] lien in livestock shall have priority over an earlier perfected lien or security interest to the extent of the difference between the acquisition price of the livestock and the fair market value of the livestock at the time the lien attaches or the sale price of the livestock, whichever is greater.

9

Iowa Code § 570A.5(3) (2012). It is this statute the Court must interpret to determine the extent of the Defendants' lien in the livestock. Though Iowa case law has addressed the issues put forth before the Court, it fails to specifically discuss determinative factors of the "acquisition price" referred to in the statute. *See Oyens Feed & Supply, Inc. v. Primebank*, 808 N.W.2d 186 (Iowa 2011) (holding the superpriority lien created by § 570A.5(3) applies only to the new value presumably created by the feed, not the acquisition value of the livestock subject to the lender's security interest). In *Oyens Feed & Supply, Inc. v. Primebank*, the Iowa Supreme Court expressly held that the superpriority provision only allows feed suppliers to recover ahead of other properly perfected liens "to the extent the acquisition value of the livestock is exceeded by the livestock's value at the time the lien attaches or its ultimate sale price."[11] *Id*. at 194. The superpriority is intended to "correspond[] to the livestock's increase in value that typically results from consuming feed." *Id*. Thus, while the Court has instruction on how to calculate the extent of a feed supplier's lien pursuant to § 570A.5(3), the Iowa Supreme Court provides no direction on how to determine the acquisition price of the livestock in order to apply the statutory formula.

The Fourth Circuit Court of Appeals instructs when interpreting a statute, a court must "first consider the plain meaning of the statutory language." *U.S. v. Ide*, 624 F.3d 666, 669 (4th Cir. 2010). The plain meaning must be viewed within "the specific context in which that language is used, and

---

[11]The Iowa Supreme Court heard *Oyens* after the District Court in the Northern District of Iowa certified issues presented on appeal of the Iowa bankruptcy court's order on a motion for partial summary judgment in *Crooked Creek Corp. v. Primebank (In re Crooked Creek)*, 427 B.R. 500 (Bankr. N.D. Iowa 2010). Based on the *Oyens* decision, the bankruptcy court's order was reversed. *Oyens Feed & Supply, Inc. v. Primebank*, No 10-CV-4049-DEO (N.D. Iowa Mar. 15, 2012).

the broader context of the statute as a whole." *Id*. As noted by the Iowa Supreme Court, when interpreting statutory provisions, the court should utilize well-established rules of statutory construction to "avoid strained, impractical or absurd results." *Renda v. Iowa Civil Rights Com'n*, 784 N.W.2d 8, 19 (Iowa 2010). Further, "[t]he goal of statutory construction is to determine legislative intent. . . . Absent a statutory definition . . . words in the statute are given their ordinary and common meaning by considering the context within which they are used." *Farmers Coop. Co. v. Swift Pork Co.*, 602 F. Supp. 2d 1095, 1108 (N.D. Iowa 2009) (quoting *Auen v. Alcoholic Beverages Div.*, 679 N.W. ed 586, 590 (Iowa 2004).

The statutory provision provides no definition of the term acquisition price. Black's Law Dictionary defines acquisition as "[t]he gaining of possession or control over something." Black's Law Dictionary (9th ed. 2009). This Court recognizes in the context of § 570A.5(3), the most common or plain meaning of acquisition price includes all costs associated with gaining possession and ownership of the livestock securing both the Defendants' liens. Accordingly, in order to properly determine the extent of the Defendants' liens pursuant to § 570A.5(3), the parties must present evidence as to all costs associated with Coastal Plains taking possession of the hogs, the actual number of hogs acquired that consumed feed supplied by the Defendants, and the actual number of hogs ultimately sold.

In the Defendants' Motion, the only costs associated with Coastal Plains acquisition of the hogs are the $13.50 per hog grower payments paid to hog growers in North Carolina, or $2,198,785.50. The Defendants then assert the gross sales price of the hogs is $19,992,573.97 and

11

that figure net of the grower payments and other post-petition payments is $10,443,256.94.[12] The Defendants assert that the net sales amount minus invoice amounts of the feed for both Defendants, $1,912,524.50, is $8,530,732.44. Using this calculation and the purported acquisition cost of the grower payments of $2,198,785.50, the Defendants argue that the Plaintiff "can present no material issue of fact that the acquisition cost exceeded $8,530,732.44, which is the least it would need to establish in order to prove that FCS and CEA are not entitled to the full amount of their liens." Mot. for Summ. J. of Farmers Coop. Soc'y and Coop. Elevator. Ass'n, 12. Further, the Defendants argue that if the amount of the invoices is greater than the difference between the sales price and the acquisition cost, only then is the extent of the lien limited by the statute. In this case, however, the difference between the sales price and the acquisition cost is significantly greater than the amount of the invoices. Therefore, the Defendants argue their claims should be allowed to the extent of the invoice amounts plus interest.

In *Oyens*, the Iowa Supreme Court made it clear that the "the superpriority provision only allows feed suppliers to trump perfected secured lenders to the extent *the acquisition value of the livestock is exceeded by the livestock's value at the time the lien attaches or its ultimate sale price.*"

---

[12]Section 570A.5(3) calculates the difference between the acquisition price of the livestock and the fair market value of the livestock at the time the lien attaches *or* the sale price of the livestock, whichever is greater. Iowa Code § 570A.4 (2012). However, the Defendants adopt the sale price of the livestock for purposes of the calculations due to the difficulties in determining the fair market value of the hogs at the time the lien attached, the date of the feed purchase. The Defendants derive the net sale price by subtracting $7,536,836.65 costs and $2,012,480.37 grower payments from the gross sales price of $19,992,573.97. In *Oyens*, if the true purpose is to determine the value added to the livestock by ingesting the feed, why is one calculation the fair market value at the time the lien attaches? The lien attaches on purchase of the feed, which would establish a fair market value prior to the feed being consumed. Such makes this lien priority statute more baffling as it would produce the type of absurd result the Iowa Supreme Court warns of in *Renda v. Iowa Civil Rights Com'n*, 784 N.W.2d 8, 19 (Iowa 2010).

*Oyens*, 808 N.W. 2d 186, 194 (emphasis added). This interpretation clearly limits the extent of the lien to the difference between the ultimate sales price and the acquisition cost of the livestock. Neither the Iowa Supreme Court, nor the statute explicitly defines the formula by stating that only if the difference in the sales price less the acquisition cost is less than the feed supplier's invoice amount, the lien is limited to the difference between the sales price and the acquisition cost. The only interpretation this Court can draw from § 570A.5(3) and the *Oyens* opinion is that the Iowa Supreme Court intended the lien to encompass the benefit received by the hogs from the livestock feed eaten and not paid for. It is not clear to this Court that the formula in the statute accomplishes what *Oyens* states is the purpose, to wit: superpriority is intended to correspond to the livestock's increase in value that typically results from consuming the feed.[13]

Application of the formula in § 570A.5(3), results in an unrealistic amount of new value totaling $10,443,256.94, from which the Defendants assert their claims are oversecured by $8,530,732.44. However, this violates the principles under Iowa law that a statute should not be construed "in a way that would produce impractical or absurd results," as the total amount of the invoices sent to Coastal Plains for the feed was $1,912,524.50.[14] *Wells Fargo Bank, N.A. v.*

---

[13]The legislature's formula only works in the simplest of examples. For instance, acquired hogs are purchased at a set purchase price from a third party and are only fed feed that is unpaid for until the hogs are sold. If the hogs are also fed feed that is paid for during the period, the formula does not work to accomplish the purpose set forth by the Iowa Supreme Court. The computation problem is exacerbated if hogs ingest feed from another supplier during this period of time from acquisition to ultimate sale. It is not clear from the affidavits whether Coastal Plains purchased and paid for the other feed from other suppliers during this time period. If so, it would seem the statute should provide for some percentage allocation of increased value based on feed supplied by different feed suppliers.

[14]For the Defendants total claim of $1,912,524.50 to not be fully secured using the net sales amount of $10,443,256.94, additional acquisition costs in excess of $8,530,732.44 would be required ($10,443,256.94 - $1,912,524.50 = $8,530,732.44). This assumes the number of

*Innovative AG Serv. Co.* (*In re Highside Pork, L.L.C.*), 450 B.R. 173, 178 (Bankr. N.D. Iowa 2011). Because the Court finds the amount of new value under the § 570A.5(3) formula does not clearly define the extent of the Defendants' liens, it must find there are genuine issues of material fact either as to the calculation of the acquisition cost or the inclusion of hogs not covered by the Defendants' liens in the sales price figures and records. Specifically, questions remain concerning how to properly ascertain the acquisition cost of the livestock in which the Defendants have a lien. Compounding this issue is the fact that Coastal Plains appears to have owned the livestock from birth until slaughter, making it difficult for the Court to determine when the hogs were actually acquired by Coastal Plains and what costs were involved in their acquisition.

While FCS and CEA do account for "other costs" totaling $7,536,836.65, and subtract these costs from the gross sales amount to arrive at the net sales amount, there is no explanation as to what these "other costs" entail or when they were incurred. Mot. for Summ. J. of Farmers Coop. Soc'y and Coop. Elevator. Ass'n, 11. If incurred prior to acquisition, some or all of the costs would be added to the $2,198,785.50 acquisition cost. In order to keep the hogs alive and growing from birth in North Carolina until the time they were shipped to Iowa, Coastal Plains incurred costs for feed, shelter, supervision, and transportation. It does not seem far fetched to assume Coastal Plains kept records of the costs and expenses that went into raising the hogs to slaughter weight. This information may be useful in determining how much Coastal Plains invested in each hog before it was shipped to Iowa and whether these expenses should be considered as part of the acquisition price

---

acquired hogs and sold hogs are the same, which remains a genuine issue of material fact. If the statute intended $8,530,732.44 to be the deciding figure for purposes of securing the claim, such profit on the sale of these hogs is inconsistent with Coastal Plains' ultimate financial condition – bankruptcy.

14

of the livestock. Otherwise, it may be useful to examine what the market price of the hogs was at the time they were shipped to Iowa, in order to determine the approximate cost Coastal Plains would have paid for each hog had it been purchased on the open market, if this amount is different from the $13.50 per hog grower payment.

The Court also finds genuine issues of material fact exist as to the sales price the Defendants used in the statutory formula. The Defendants assert the gross sales price of the livestock that was subject to their liens was $19,992,573.97 and the net figure after application of payments by Coastal Plains is $10,443,256.94. However, the Plaintiff contends the sales amount used by the Defendants includes the sale of hogs that were not fed the feed that FCS and CEA did not receive payment for, were only fed feed FCS and CEA did not receive payment on for a limited amount of time, or were not fed any of the feed FCS and CEA did not receive payment for. Therefore, the Court must find genuine issues of material fact exist as to the calculation of the sales amount of the livestock and the actual number of livestock fed from the feed the Defendants provided, but were not paid for.

FCS and CEA also assert they are entitled to interest pursuant to § 506(b) based on their status as oversecured creditors. Because the Court finds there are genuine issues of material fact related to the calculation of the extent of the Defendants' lien in the livestock, the Court is unable to determine whether FCS and CEA are oversecured creditors. Therefore, the Court finds there is a genuine issue of material fact as to whether FCS and CEA are entitled to post-petition interest and refrains from determining whether interest shall accrue.

## II.  PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The Plaintiff asserts it is entitled to partial summary judgment and seeks a declaration that FCS and CEA are not entitled to claim priority over the Plaintiff's liens for certain charges that are

15

not for livestock feed itself, including labor and finance charges. The Plaintiff argues such charges are not considered part of the retail cost of the agricultural supply as provided by Iowa Code § 570A.3. The Plaintiff also asserts FCS is not entitled to priority liens in livestock for feed supplied to seven farms that were not included in the financing statements perfecting the feed supplier's liens. In total, the Plaintiff asks the Court to find as a matter of law that the Defendants are not entitled to priority for a total of $215,762.81.

### A.  Feed vs. Non-Feed Charges

The Plaintiff objects to the inclusion of charges for the grinding, mixing, delivery of feed, as well as charges for delivery of the feed and fuel. In total, the Plaintiff objects to charges in the amount of $65,336.49 and $49,538.85 by FCS and CEA, respectively. The Plaintiff asserts that § 570A.5(3) clearly only applies to livestock feed and the term feed is defined only as "a commercial feed, feed ingredient, mineral feed, drug, animal health product, or customer-formula feed . . . used for the feeding of livestock." Iowa Code § 570A.1 (2012). Therefore, the Plaintiff claims the term feed only applies to items that would be ingested by livestock. However, this definition of feed fails to account for the § 570A.3, which provides the amount of the lien shall be "the retail cost of the agricultural supply, including labor provided." Iowa Code § 570A.3(2) (2012). The definition section of the statutory provision defines labor to include "labor performed in the application, delivery, or preparation of a product," including feed. Iowa Code § 570A.1(11). Viewed in the context of these additional statutory provisions, the Court cannot find as a matter of law that FCS and CEA are not entitled to superpriority for costs for labor and delivery, including fuel charges.

Further evidencing the Iowa legislature's intent to include labor in the cost of feed is § 570A.3(2), which provides the lien applies to the "[l]ivestock consuming the feed" but not to the

"portion of the livestock of a farmer who has paid all amounts due . . . for the retail cost, including labor, of the feed." Iowa Code § 570A.3(2) (2012). By specifically excluding from a lien the retail cost, including labor, of all feed already paid for by a farmer, the Iowa legislature clearly considered labor in the cost of the feed. If labor is part of the retail cost of feed already paid for that no longer serves as a basis for a lien, then it is no stretch to find that the Iowa legislature intended labor, defined to include delivery, to be included in the agricultural supply that serves as the basis for a lien.

In response to the Plaintiff's objection to "non-feed" related charges, the Defendants agree certain costs were not worth the expense of litigation, even though they do not concede the charges should not be entitled to superpriority pursuant to § 570A.5(3). In the Supplemental Response by FCS and CEA to the Motion for Partial Summary Judgment Filed by FNBO and Reply by FCS and CEA to Their Pending Motion for Summary Judgment, FCS agreed to reduce its claim by $1,243.91 for the "feed transfer services" and $124.08 for comfort board and lumber delivery. Similarly, CEA agreed to reduce its claim by $2,858.87 to account for charges for comfort board, citric acid, actisheild 40, compost a mat, and demon wp. Thus, the Court finds FCS and CEA's claims, as filed, should be reduced by these amounts. As to the Plaintiff's objection to the remaining $413.96 of the total $3,272.83 for "non-feed" charges, the Court finds there is a genuine issue of material fact as the parties do not agree.

### B. Interest and Finance Charges

The Plaintiff also argues FCS and CEA are not entitled to priority for $2,252.33 and $6,005.85 in interest charges, respectively. As the Court has determined genuine issues of material fact exist as to the Defendants' entitlement to claims for interest, so to must the Court determine a genuine issue of material fact as to the Defendants' claims for pre-petition and post-petition interest.

17

### C. Unperfected Feed Sales

Finally, the Plaintiff asserts FCS is not entitled to a superpriority lien for feed sold to seven farms that FCS failed include in its financing statements. In order to perfect a lien obtained pursuant to § 570A.5(3), an agricultural supply dealer must file a financing statement with the Office of the Secretary of State of Iowa within thirty-one days after the date of the purchase of the agricultural supply. Iowa Code § 570A.4(2) (2012); *Oyens*, 808 N.W.2d 186, 189 (explaining section 570A.4 requires suppliers to comply with article 9 perfection requirements). Pursuant to both Iowa and North Carolina's codified versions of the Uniform Commercial Code, a financing statement is sufficient if it "indicates the collateral covered by the financing statement." Iowa Code § 557.9502(1)(c) (2012); N.C. Gen. Stat. § 25-9-502(a)(3) (2012). A financing statement indicates the collateral by stating it covers "all assets" or "all personal property," or provides a more specific listing by category or otherwise, that makes "the identity of the collateral [] objectively determinable."[15] Iowa Code §§ 554.9504, .9108(2)(a)-(f) (2012); N.C. Gen. Stat. §§ 25-9-504, -9-108(b)(1)-(6) (2012).

The Plaintiff argues that because FCS failed to specifically list the Back, De Jager, Habben, Hibma, Lincoln, Lux, and Prunty farms in its financing statements, FCS is not entitled to claim superpriority lien on feed fed to hogs on those farms in the amount of $88,112.55. In the financing

---

[15]A super-generic clause, such as "all assets" or "all personal property," is insufficient to identify collateral for the purposes of a security agreement. Iowa Code § 554.9018(3) (2012); *Wells Fargo Bank Minn., N.A. v. Robex, Inc.*, 711 N.W.2d 732 (Iowa Ct. App. 2006) (Table, Text in Westlaw) (citing *Merchants Nat'l Bank v. Halberstadt*, 425 N.W. 2d 429, 432 (Iowa Ct. App. 1998) (explaining collateral need not be specified in a financing statement because it is designed to warn subsequent creditors of existing security interests); N.C. Gen. Stat. § 25-9-108(c) (2012) *see* U.C.C. § 9-108 cmt. 2 (2012). In this case, the lien created is statutory, not consensual, and all that is required under § 570A.4 is to file a financing statement within thirty-one days of the feed purchase. No security agreement is required.

statements filed by FCS, in both North Carolina and Iowa, each form states the financing statements cover "All livestock located at:" followed by each specific farm name and address. The financing statements do not include any super-generic language such as "all assets," or any other language that would attempt to include the unlisted farms with the listed collateral. FCS asserts the phrase "All livestock" is sufficient to include the collateral on the unlisted farms. However, as FCS noted at the hearing, no comma follows "All livestock" in any of the financing statements, suggesting FCS intended to limit its security interest to the livestock located at the individually enumerated farms.

All that is required for an agricultural supply dealer to perfect its lien in livestock is to file a financing statement, which properly indicates its collateral, within thirty-one days of the purchase of the agricultural supply. Iowa Code § 570A.4 (2012). FCS failed to meet this requirement. Therefore, the Court finds there is a no genuine issue of material fact as to whether the FCS has a properly perfected security interest on the hogs located at the Back, De Jager, Habben, Hibma, Lincoln, Lux, and Prunty Farms for feed because FCS failed to specifically include these farms on the financing statements filed in both Iowa and North Carolina. The total amount of the feed sold to livestock on these seven farms was $88,112.55, the amount of which FCS is not entitled to a lien.

## CONCLUSION

After reviewing the motions and supporting evidence in the light most favorable to the non-moving parties, the Court finds genuine issues of material fact exist. Review of the Defendants' Motion reveals issues exist regarding the acquisition price of the hogs delivered to the various farms and whether expenses for feed, transportation, shelter, and supervision should be considered in the acquisition price. Further, the Court is not convinced the gross and net sales prices accurately determine the value of the hogs the Defendants assert their lien covers. Questions still remain as to

whether the sales prices include hogs that did not ingest any of the unpaid for feed and what the sales price was for the hogs that did ingest the feed supplied by the Defendants. Finally, review of the Plaintiff's Motion reveals genuine issues of material fact exist as to the whether the Defendants are entitled to $413.96 for "non-feed" charges as well as charges for interest and financing.

Therefore, the Court finds the Defendants' Motion is **DENIED**. The Plaintiff's Motion is **DENIED** in part as to the "non-feed" charges and interest charges; and is **GRANTED** in part as to the unperfected feed sales by FCS in the amount of $88,112.55. Based on the concessions of FCS in the amount of $1,367.99 and CEA in the amount of $2,858.87 it is further **ORDERED** that FCS and CEA's claims be reduced accordingly.

**SO ORDERED.**

**END OF DOCUMENT**